STATE OF NORTH CAROLINA v. KHURAM ASHFAQ CHOUDHRY

No. 409A10

(Filed 26 August 2011)

**Constitutional Law— effective assistance of counsel—inquiry regarding prior representation of State's witness—failure to show prejudice**

Although under the facts of this case, the trial court's inquiry pertaining to defense counsel's possible conflict of interest arising from his prior representation of a State's witness was insuffcient to assure that defendant knowingly, intelligently, and voluntarily made his decision regarding counsel's continued representation, defendant failed to make a threshold showing that defense counsel's performance was adversely affected by the conflict or that defendant was prejudiced by the representation.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, —— N.C. App. ——, 697 S.E.2d 504 (2010), finding no error in a judgment entered 19 September 2008 by Judge Henry W. Hight, Jr. in Superior Court, Durham County. Heard in the Supreme Court 14 March 2011.

*Roy Cooper, Attorney General, by Melissa L. Trippe, Special Deputy Attorney General, for the State.*

*M. Gordon Widenhouse Jr. for defendant-appellant.*

EDMUNDS, Justice.

In this case we consider whether the trial court conducted an adequate inquiry pertaining to defense counsel's possible conflict of interest arising from his prior representation of a State's witness. Although the trial court heard argument from the prosecutor and from defense counsel on this issue and made direct inquiry of defendant after placing him under oath, we conclude that, under the facts of this case, the inquiry was insufficient to assure that defendant knowingly, intelligently, and voluntarily made his decision regarding counsel's continued representation. However, because defendant has failed to make a threshold showing that defense counsel's performance was adversely affected by the conflict, much less that defendant was prejudiced by the representation, we modify and affirm the decision of the Court of Appeals.

**STATE v. CHOUDHRY**

[365 N.C. 215 (2011)]

## Factual and Procedural Background

At trial, the State presented evidence that during the evening of 3 November 2002, defendant Khuram Choudhry drove his friends Umar Malik and Hasan Sokoni to a BP gas station on Chapel Hill Boulevard in Durham where the victim Rana Shazad Ahmed ("Shazad," or "the victim") was employed. Sokoni, who was sitting in the back seat, testified that he could tell defendant and Malik "weren't happy" with the victim and that he later heard there was "a beef between Shazad and the mother and sister of [defendant]." Sokoni testified that he "could kind of . . . tell that there was some type of altercation that was going to happen because they were mad," and he "assume[d]" defendant and Malik were looking for Shazad to "chastise" him or "rough him up." Seeing that Shazad was closing the store, defendant drove the three to Shazad's apartment complex about a mile away and waited. When Shazad pulled into the apartment parking lot, defendant and Malik jumped out of the car. Sokoni, who remained in the back seat of defendant's car, heard "two or three hits" that sounded like "balls being hit by a baseball bat." A minute or two later, defendant and Malik ran back to the car and defendant drove the three back to his residence in Durham. Sokoni testified that at the time he asked no questions of defendant or Malik, but added that two weeks after the incident, he observed defendant stop on Interstate 85 during a trip to Virginia and throw a bat from his vehicle.

Defendant's then-girlfriend Michelle Wahome testified that in November 2002, she was awakened by a late-night telephone call from defendant. She related that defendant sounded "panicky" and said, " 'Oh my God, oh my God, you won't believe what happened. . . . Shazad's gone. Shazad's dead. He's gone out of this world.' " When Wahome asked him to clarify, defendant told her the victim had called his house and cursed out his mother, so he, Malik, and Sokoni drove to the victim's residence to " 'F' him up." Defendant added that although Sokoni had promised to help, he reneged.

According to Wahome, defendant told her he hit the victim once with a bat or a stick and that Malik then took the bat or stick and hit the victim on the head so hard that he fell to the ground. While the victim was down, Malik kept hitting him until he stopped moving. Defendant told her he was not worried about DNA evidence, but mentioned that he had left his pack of Newport cigarettes at the scene. Wahome expressed skepticism, so defendant told her to look at the newspapers in the morning. When she did, she saw a report that the victim had been murdered.

At approximately 6:30 a.m. on 4 November 2002, the victim's roommates awoke to find him lying in a pool of blood outside the door to their apartment. The victim was breathing, but unresponsive and cold to the touch. Arriving paramedics found the victim flat on his back, unconscious. They observed a "very large amount of blood" and a laceration on the back of the victim's head. His eyes were bruised and swollen shut, indicating that he "ha[d] been down for quite a while." The victim was transported to Duke Hospital where he died approximately eleven days later. An autopsy revealed two lacerations to the victim's head, multiple skull fractures, bleeding in the brain, and bruising to his arms, neck, chest, and back. The cause of death was determined to be blunt force trauma to the head.

At the crime scene, investigators recovered the victim's wallet, a pack of Newport cigarettes, and samples of blood and hair. Although the blood and hair were identified as having come from the victim, no fingerprints were found on the cigarette pack.

Wahome further testified that she made several statements to police during the course of the investigation. She testified that she continued to date defendant after the telephone call in which he told her of his participation in the victim's murder but, following a discussion with her father, went to the Durham Police Department on 25 June 2003 and gave a written statement to Investigator Delores West. At the time Wahome initially contacted police, the investigation of the victim's murder had run into a dead end. In this statement, Wahome related that defendant identified Malik as having beat the victim, while also initially admitting, but then denying, his own complicity.

Although Wahome did not appear to Investigator West to be impaired in any way during the interview, a few days later she called Investigator West to retract her statement, claiming she had been high on drugs and had not told the truth. However, at defendant's trial, Wahome testified on cross-examination that she recanted her initial statement because of threats from defendant.

On 21 November 2003, Wahome gave another statement to investigators describing defendant's telephone call to her after the beating. This statement differed in several respects from her June 2003 statement, including the month of defendant's initial telephone call to her describing the incident.

On 21 June 2006, Wahome was arrested for trafficking heroin. While in custody, she sent letters from the Durham County Jail to Investigator West on 21 August and 27 September 2006. In response,

Investigator West interviewed Wahome on 28 August and again on 14 September 2006. During the September interview, Wahome provided Investigator West the name "Hasan" as someone who might have first-hand knowledge of the murder and gave information as to where he could be found. The drug charge against Wahome was dismissed on the ground that "[f]urther evidence indicates Defendant had no knowledge of presence of drugs and that drugs likely planted by another individual."

On 26 September 2006, Investigator West located and interviewed Hasan Sokoni. Sokoni implicated defendant, recounted the course of events the night of the victim's murder, and said that he, defendant, and defendant's two sisters and brother-in-law had later driven to Virginia, where defendant disposed of the murder weapon. Sokoni's trial testimony, though reluctant, was consistent with this statement.

On 27 September 2006, officers arrested defendant and Malik. Defendant waived his right to an attorney. When questioned by Investigator West, defendant denied killing the victim, stated that "Umar [Malik] must be smoking crack if he said [defendant] was part of the beating," and added that "[Wahome's] mother was paying people to lie on him." While being questioned by Investigator West, defendant told her that the Newport cigarettes she had taken from him in 2003 in connection with an unrelated matter were not the cigarettes recovered at the murder scene. Defendant made this statement even though Investigator West apparently had not referred to the cigarettes she had previously collected from him, nor had any television or newspaper report described evidence collected during the investigation of the victim's murder.

Defendant was indicted for first-degree murder on 27 November 2006. Malik had absconded to Pakistan and was unavailable, but Sokoni and Wahome testified on behalf of the State. As detailed below, defendant's counsel had previously represented Wahome in a different criminal case. On 19 September 2008, defendant was tried noncapitally and convicted of first-degree murder. The trial court imposed a sentence of life imprisonment without parole.

Defendant filed a notice of appeal to the Court of Appeals. In a split decision, the Court of Appeals found no error. *State v. Choudhry*, — N.C. App. —, —, 697 S.E.2d 504, 512 (2010). The dissenting judge contended that, in light of the possible conflict of interest arising from defense counsel's earlier representation of Wahome, the trial court erred by failing to conduct an inquiry to fully inform

defendant of the consequences of the potential conflict "such that [d]efendant was able to knowingly, intelligently, and voluntarily make a decision regarding counsel." *Id.* at ——, 697 S.E.2d at 512. (Beasley, J., dissenting). Accordingly, the dissenting judge would remand for an evidentiary hearing on the matter. *Id.* at ——, 697 S.E.2d at 513. Defendant appeals to this Court as of right on the basis of the dissenting opinion pursuant to N.C.G.S. § 7A-30(2). Defendant's petition for discretionary review as to additional issues was denied by order of the Court on 7 October 2010.

## Analysis

Underlying defendant's claim that the trial court's inquiry was inadequate is an assumption that defense counsel's multiple representation of Wahome constituted a conflict of interest. Accordingly, we begin with a review of conflicts arising from multiple representation and the trial court's responsibility when confronted with the possibility of such a conflict.

A defendant in a criminal proceeding has the right to effective assistance of counsel under both the federal and state constitutions. *Strickland v. Washington,* 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692 (1984); *State v. Braswell,* 312 N.C. 553, 561-63, 324 S.E.2d 241, 247-48 (1985). "The right to effective assistance of counsel includes the 'right to representation that is free from conflicts of interest.'" *State v. Bruton,* 344 N.C. 381, 391, 474 S.E.2d 336, 343 (1996) (quoting *Wood v. Georgia,* 450 U.S. 261, 271, 67 L. Ed. 2d 220, 230 (1981)).

When a defendant raises a claim of ineffective assistance of counsel, in most instances he or she must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693; *accord State v. Waring,* 364 N.C. 443, 502, 701 S.E.2d 615, 652 (2010). However, when the claim of ineffective assistance is based upon an actual, as opposed to a potential, conflict of interest arising out of an attorney's multiple representation, a defendant may not be required to demonstrate prejudice under *Strickland* to obtain relief. *Strickland,* 466 U.S. at 692, 80 L. Ed. 2d at 696; *Cuyler v. Sullivan,* 446 U.S. 335, 349, 64 L. Ed. 2d 333, 347 (1980); *State v. Phillips,* 365 N.C. 103, 118, 711 S.E.2d 122, 135 (2011). The test to determine whether a defendant is entitled to relief under such circumstances without having to demonstrate prejudice is dependent upon the level of notice given to the trial court and the action taken by that court. *See Phillips,* 365 N.C. at 118-20, 711 S.E.2d at 135-36.

STATE v. CHOUDHRY

[365 N.C. 215 (2011)]

"Absent special circumstances" a trial court may assume multiple representation entails no conflict of interest or that the defendant and defense counsel knowingly accept the risk of a conflict. *Sullivan,* 446 U.S. at 346-47, 64 L. Ed. 2d at 345-46. However, this assumption may not apply if the trial court is "on notice that a multiple representation may create a conflict of interest." *Id.* at 346, 64 L. Ed. 2d at 345. While the court is not required to act if it is aware only "of a vague, unspecified possibility of conflict," *Mickens v. Taylor,* 535 U.S. 162, 169, 152 L. Ed. 2d 291, 302 (2002), when the court "knows or reasonably should know" of "a particular conflict," that court must inquire "into the propriety of multiple representation," *Sullivan,* 446 U.S. at 346-47, 64 L. Ed. 2d at 345-46. If a defendant who objects to multiple representation is denied "the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial," prejudice is presumed. *Id.* at 348, 64 L. Ed. 2d at 346. But when no objection is raised to the multiple representation, reversal is not automatic if the trial court fails to conduct the *Sullivan* inquiry. *Id.* at 348-49, 64 L. Ed. 2d at 346-47; *see also Mickens,* 535 U.S. at 172-74, 152 L. Ed. 2d at 304-05. In such a scenario, prejudice will be presumed only if a defendant can establish on appeal that "an actual conflict of interest adversely affected his lawyer's performance." *Sullivan,* 446 U.S. at 350, 64 L. Ed. 2d at 348; *see also Mickens,* 535 U.S. at 173-75, 152 L. Ed. 2d at 304-05.

Applying the template set out in *Sullivan, Strickland,* and *Mickens* to this case, we must consider at the outset whether any inquiry by the trial court was necessary. The trial court was put on notice when the prosecutor brought the possible conflict to the judge's attention. The prosecutor began cautiously, telling the court that while she did not know whether a real conflict existed, failure to consider a genuine conflict could result in a reversal. Turning to specifics, the prosecutor advised the court that Wahome was defendant's former girlfriend, and that the two had a three-year-old child together. In 2003, while defendant and Wahome were in a relationship, charges were filed against Wahome arising from an incident at a Raleigh shopping mall. According to the prosecutor, the charges were "reduced down" to two counts of common law forgery. The prosecutor observed that, although defendant had not been charged in connection with the 2003 incident, both he and Wahome appeared in the video surveillance tape taken at the store, and the items involved were men's apparel. The prosecutor pointed out that Wahome had been represented by Durham criminal defense attorney James D. "Butch" Williams, Jr., who was representing defendant in

the case at bar. Further, Wahome told the prosecutor that defendant had instructed her to hire Mr. Williams as her defense attorney.

In response, Mr. Williams stated, "I don't know if it even needs addressing, Judge. There is not [a] conflict." He added that defendant had not hired him to represent Wahome on her 2003 charges. As to the case at bar, Mr. Williams told the court that he had not intended to cross-examine Wahome about the 2003 incident.

Thus, no party objected to defense counsel's multiple representation. Nevertheless, while we acknowledge the *Sullivan* assumption that, absent special circumstances, multiple representation does not give rise to a conflict of interest or that defendant and defense counsel knowingly accept the risk of a conflict, the prosecutor's description of defense counsel's multiple representation of Wahome and defendant was sufficient to put the trial court on notice of a "particular conflict." *See Sullivan*, 446 U.S. at 347, 64 L. Ed. 2d at 346. Accordingly, we agree with the trial court's tacit conclusion that Mr. Williams's prior representation of Wahome constituted at least a potential conflict of interest and that an inquiry was necessary.

After briefly discussing the multiple representation with counsel for both sides, the trial court placed defendant under oath and asked the following questions:

THE COURT: Mr. Choudhry, I'm going to ask you some questions. You don't need to keep your hand raised. If you don't understand any question I ask you, tell me and we'll go over it again until you do. Are you able to hear and understand me?

[DEFENDANT]: Yes.

THE COURT: Do you understand that you are charged with First Degree Murder?

[DEFENDANT]: Yes.

THE COURT: And you understand that that charge carries a possible maximum term imprisonment of life in prison without parole?

[DEFENDANT]: Yes.

THE COURT: It has been indicated to this Court that a person may be called in as a witness in this case who was at some time in the past represented by your attorney, Mr. Williams. That witness being, is this Renee Wright?

**STATE v. CHOUDHRY**

[365 N.C. 215 (2011)]

[DEFENSE COUNSEL]: No. It's Michelle Wahome.

THE COURT: Michelle Wahome. Michelle Wahome.

. . . .

THE COURT: You understand that?

[DEFENDANT]: Yes.

THE COURT: And it's further—have you talked to Mr. Williams about that?

[DEFENDANT]: About the case?

THE COURT: No. Did you understand that Ms. Wahome might testify in this case and that Mr. Williams had represented her in the past?

[DEFENDANT]: Yes, sir.

THE COURT: Did you have any concerns about whether or not Mr. Williams can appropriately represent you in this case because he represented a witness for the State in the past?

[DEFENDANT]: No.

THE COURT: Are you satisfied with his representation of you to this point?

[DEFENDANT]: Yes.

THE COURT: And even in light of the fact that he represented a future witness in this case, do you desire for him to continue as your attorney in this matter?

[DEFENDANT]: Yes.

THE COURT: And do you want to talk to him or me to make any further inquiry of him about his participation in that prior case or are you satisfied where you are?

[DEFENDANT]: Satisfied.

THE COURT: Okay. Thank you, sir. Anything further from the State?

[PROSECUTOR]: No, sir.

**STATE v. CHOUDHRY**

[365 N.C. 215 (2011)]

THE COURT: Anything further from the Defendant?

[DEFENSE COUNSEL]: No, Judge.

THE COURT: Mr. Sheriff, you may bring the jury in.

Defendant contends that the trial court should have conducted an evidentiary hearing. However, trial courts can determine in their discretion whether such a full-blown proceeding is necessary or whether some other form of inquiry is adequate and sufficient. *See, e.g., State v. Walls*, 342 N.C. 1, 39-40, 463 S.E.2d 738, 757-58 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996) (finding trial court's inquiry into potential conflict of interest adequate).

Defendant further contends that the trial court's inquiry was not sufficient to inform him of the consequences of any potential conflict of interest and that, as a result, he did not knowingly, intelligently, and voluntarily waive any such conflict. When a conflict is identified, "[t]he standard for the validity of a sixth amendment waiver [by a defendant] is that it be voluntarily, knowingly, and intelligently made." *State v. Nations*, 319 N.C. 318, 326, 354 S.E.2d 510, 515 (1987) (citations omitted). Accordingly, at such an inquiry into the propriety of multiple representation, *Sullivan*, 446 U.S. at 346-47, 64 L. Ed. 2d at 345-46, the trial court is responsible for ensuring that the defendant fully understands the consequences of a potential or actual conflict. *See, e.g., State v. Ballard*, 180 N.C. App. 637, 642-43, 638 S.E.2d 474, 479 (2006), *disc. rev. denied*, 361 N.C. 358, 646 S.E.2d 119 (2007); *State v. James*, 111 N.C. App. 785, 791, 433 S.E.2d 755, 758-59 (1993). As a trial court addresses conflicts and waivers, the position of defense counsel may be pertinent. "[D]efense counsel are often in the best position to recognize when dual representation presents a conflict of interest; thus, they shoulder an ethical obligation to avoid conflicting representations and to promptly inform the trial court when a conflict arises." *Walls*, 342 N.C. at 40, 463 S.E.2d at 758 (citing *Sullivan*, 446 U.S. at 346-47, 64 L. Ed. 2d at 345-46), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). In addition, defense attorneys are particularly well situated to advise their clients whether, and to what extent, a conflict exists. Accordingly, while a trial court may not rely solely on representations of counsel to find that a defendant understands the nature of a conflict, the court reasonably may consider the statements of counsel when determining both whether an actual conflict exists and, if so, whether the defendant is knowingly, intelligently, and voluntarily waiving his or her rights to conflict-free representation.

Here, once the prosecutor broached the issue of a possible conflict, defense counsel responded in defendant's presence that he did not intend to question Wahome about "any issues relative to [his prior representation]," characterizing the prosecutor's concerns as "total utter nonsense." The trial court then informed defendant directly that Mr. Williams had previously represented a witness who would be testifying for the State in the case at bar. After receiving defendant's acknowledgment, the court asked defendant if he had any concerns about Mr. Williams's ability appropriately to represent him, if he was satisfied with Mr. Williams's representation, and if he desired to have Mr. Williams continue to represent him. Defendant responded he had no concerns about Mr. Williams's representation and gave an affirmative answer to each remaining question posed by the court. However, the trial court did not specifically explain the limitations that the conflict imposed on defense counsel's ability to question Wahome regarding her 2003 criminal charges, nor did defense counsel indicate that he had given defendant such an explanation. Accordingly, we are unable to conclude that the trial court established that defendant had sufficient understanding of the implications of Mr. Williams's prior representation of Wahome to ensure a knowing, intelligent, and voluntary waiver of the potential conflict of interest.

Although the *Sullivan* line of cases deals with instances in which the trial court failed to conduct any inquiry "into the propriety of multiple representation," 446 U.S. at 346, 64 L. Ed. 2d at 345, we believe these cases also apply where, as here, the trial court's inquiry is inadequate or incomplete. Thus, prejudice to defendant is presumed if he can demonstrate an actual conflict of interest that adversely affected his defense counsel's performance. *Strickland*, 466 U.S. at 692, 80 L. Ed. 2d at 696 (citing *Sullivan*, 446 U.S. at 350, 348, 64 L. Ed. 2d at 348, 346). However, if defendant is unable to establish an actual conflict causing an adverse effect, he must show that he was prejudiced in order to obtain relief. *See, e.g., Winkler v. Keane*, 7 F.3d 304, 307, 310 (2d Cir. 1993), *cert. denied*, 511 U.S. 1022, 128 L. Ed. 2d 79 (1994).

The record indicates that Wahome testified for the State that she had received a telephone call from defendant in November 2002, around the time the victim was killed. During this call, defendant admitted hitting the victim with a bat or a stick before Malik took over and continued the beating. Therefore, Wahome's testimony both corroborated Sokoni's and provided the only direct evidence that defendant himself had struck the victim.

Defendant elected not to present evidence. Instead, he focused on discrediting Wahome. Defense counsel cross-examined Wahome with vigor, attempting to demonstrate that she cooperated so she could get out of jail. He elicited from both Wahome and Investigator West testimony revealing that Wahome was in custody on a charge for heroin trafficking at the time she reinitiated contact with West, asking for help. Although Wahome insisted that the trafficking charge was baseless and that she had been framed by defendant, defense counsel was able to establish through cross-examination that it was only after Wahome gave statements to Investigator West that her bond was reduced twice, she was released from jail, and the trafficking charge was dismissed. Wahome acknowledged that after being released, she wrote a thank-you note to Investigator West.

In addition, defense counsel questioned Wahome about inconsistencies between her trial testimony and her various statements to police. He pointed out Wahome's uncertainty whether defendant first called her about the incident immediately after the beating or eleven days later, after the victim died. Defense counsel also pointed out that, even though the fatal beating occurred in November, Wahome said in her 21 November 2007 statement to Investigator West that she had received defendant's call in February or March. Under defense counsel's questioning, Wahome conceded that she failed to tell investigators that she and defendant met with the victim's uncle after the beating or that defendant had told her he had hidden the bat where investigators could not find it. Defense counsel elicited from Wahome an acknowledgment that in her first statement to Investigator West on 25 June 2003, she related that defendant initially told her that he and Malik had beat the victim, but that he then said Malik had committed the assault while he (defendant) did not hit the victim "because he got scared."

Defense counsel further established that the relationship between Wahome and defendant was rancorous and volatile and that Wahome's actions toward defendant were frequently spiteful and vindictive. She conceded that she wanted to obtain custody of their child from defendant. She further conceded that she had filed a domestic violence report against defendant and that the resulting charges had been dismissed when she did not come to court. She admitted making several harassing telephone calls to defendant's family. She acknowledged that, several days before defendant's trial began, she sent defendant the following text message: "[Y]ou let your ho's and your family f[——] me up, so now I'm going to let [Investi-

gator] West and the jury f[——] you up. It's called karma so, deal with it, and I will get my son without your help." The morning trial began, she sent him another text message stating that: "[B]itch, I'm going to f[——] you up tomorrow. We not cool. Don't think I'm going to fall for your lies. Go to hell with feeling sorry for yourself."

Thus, while Wahome steadfastly contended that defendant was abusive toward her and had admitted his involvement in the killing, defense counsel was able to establish that Wahome's statements to investigators were incomplete and inconsistent, that she wanted to obtain custody of their child from defendant, that she used the legal system to seek revenge against those she felt had done her wrong, and that she wished defendant ill. Finally, though the record is sparse as to details of the 2003 incident that led to Wahome's forgery charges, the evidence provided suggests that defendant was involved. Defense counsel did not call defendant as a witness, thus protecting him from cross-examination about his criminal history. While cross-examination of Wahome about her 2003 charges could have further undermined her credibility, it equally well could have opened the door for redirect examination by the State relating to any role defendant may have played. Thus, objectively sound strategic reasons unrelated to the former representation appear to have existed for defense counsel to avoid asking Wahome about her charges.

Defense counsel's cross-examination of Wahome was extensive, searching, and adversarial. We see no indication of the adverse effect on defense counsel's performance required to win an automatic reversal under the *Sullivan* line of cases. In addition, we fail to find any prejudice accrued to defendant as a result of defense counsel's prior representation of Wahome. Accordingly, we modify and affirm the decision of the Court of Appeals.

MODIFIED AND AFFIRMED.