STATE v. GRAY

[225 N.C. App. 431 (2013)]

STATE OF NORTH CAROLINA

v.

VERNON PETE GRAY, III

No. COA12-153

Filed 5 February 2013

**Constitutional Law—effective assistance of counsel—conflict of interest—new trial**

An armed robbery defendant received a new trial where his counsel had represented a state's witness in a prior unrelated matter and the record clearly reflected that defendant refused to waive the potential conflict of interest and requested new counsel. Neither the judge at a pretrial hearing nor the trial judge conducted any inquiry into the nature and extent of the potential conflict or whether defendant wished to knowingly, intelligently, and voluntarily waive the conflict. The showing of an actual conflict of interest that adversely affected defendant's representation was not required because defendant objected to continued representation by the trial counsel and requested new counsel.

Appeal by defendant from judgment entered 4 October 2011 by Judge William R. Pittman in Forsyth County Superior Court. Heard in the Court of Appeals 14 August 2012.

*Attorney General Roy Cooper, by Assistant Attorney General John F. Oates, Jr., for the State.*

*John Keating Wiles for Defendant.*

ERVIN, Judge.

Defendant Vernon Pete Gray, III, appeals from a judgment sentencing him to a term of sixty to eighty-one months imprisonment based upon his conviction for robbery with a dangerous weapon. In challenging the trial court's judgment, Defendant argues that the trial court erred by proceeding to conduct Defendant's trial despite the fact that Defendant objected to continuing representation by his appointed counsel on the grounds that his appointed counsel had previously represented one of the State's witnesses. After careful consideration of Defendant's challenge to the trial court's judgment in light of the record and the applicable law, we conclude that Defendant is entitled to a new trial.

STATE v. GRAY

[225 N.C. App. 431 (2013)]

I.  Factual Background

A.  Substantive Facts

1.  State's Evidence

Around 11:00 a.m. on 29 August 2010, an individual entered a Family Fare BP station located on University Parkway in Winston-Salem. At that time, the perpetrator demanded that the store clerk, Dana Palm, give him the money from the cash register, which totaled approximately $150.00 to $180.00. As he did so, the perpetrator threatened Mr. Palm with a box cutter. After taking the money, the perpetrator left the store, at which point Mr. Palm called 911 to report the robbery. Although Mr. Palm indicated at an identification procedure conducted shortly after Defendant was taken into custody in the immediate aftermath of the robbery that he had a "good idea" that Defendant had committed the robbery, he concluded that Defendant was the perpetrator "without a shadow of a doubt" after viewing a Family Fare surveillance video and identified Defendant as the individual who committed this robbery during his trial testimony.

Lieutenant Joseph Ferrelli of the Winston-Salem Police Department, who was on duty near the Family Fare on the morning of 29 August 2010, heard a call reporting the robbery and proceeded to the store, where he encountered Mr. Palm. At that time, Mr. Palm described the robber as a black male who wore a gray hooded sweatshirt, black plastic framed sunglasses, light colored khaki pants, and white tennis shoes. Although the robber had facial hair, Mr. Palm could not tell whether he had a full beard or a goatee because the sweatshirt hood was pulled up over his head. After Mr. Palm indicated that the perpetrator had left the store heading south, Lieutenant Ferrelli drove in that direction on University Parkway.

On 29 August 2010, Gregory Slade, who sold newspapers for the Winston-Salem Journal, was working at the corner of Bonhurst and Deacon Boulevard, a location from which he could see the Family Fare. On that morning, Mr. Slade saw Defendant, who was wearing a gray hoodie, running up the street toward the Family Fare. Although Defendant also approached a Pizza Hut, it was not open. Eventually, Mr. Slade noticed Defendant going back and forth between the Pizza Hut and an International House of Pancakes, apparently asking people for rides. After investigating officers approached Mr. Slade to find out if he had noticed anyone running in the area, he pointed out Defendant, who was heading toward the parking area of a nearby pawnshop.

Upon receiving this information, Lieutenant Ferrelli and Officers Sarah Allen and Kymberli Oakes detained Defendant in the pawnshop parking lot. Although the morning was a hot one and although the pawnshop was located about two tenths of a mile from the Family Fare, Defendant was not sweating or out of breath. Lieutenant Ferrelli found a gray sweatshirt and "swim goggles" in the dumpster beside the International House of Pancakes. Officers Oakes and Allen, who frisked Defendant, seized a silver box cutter, a scarf, a pair of gloves, and $238.00 in cash, $55.00 of which was in Defendant's wallet and $183.00 of which was in his pocket. According to an identification card found on his person, Defendant lived near the area at which he was detained.

## 2. Defendant's Evidence

Defendant testified that he worked a 3:00 to 11:00 p.m. shift at Hanes Brands during August 2010. Among other things, Defendant was required to break down boxes in the course of his work. Defendant used a box cutter in connection with this aspect of his work, since the tape was hard to remove by hand. On the morning of 29 August 2010, Defendant put on his pants without giving any thought to whether a box cutter might be in his pocket.

After taking his wife to work, Defendant decided to get shoes for his step-son using money that he had received from his wife. However, Defendant's car broke down and could not be restarted. Once Defendant, with some assistance from a couple of passers-by, had pushed his car into a parking lot near the Family Fare, he decided to walk home. As he was walking toward his residence, he was stopped by the police near the pawnshop. At the time that he was detained, Defendant had a box cutter, a scarf, a pair of gloves, his wallet, an identification card, and about $230.00 on his person or in his wallet. Defendant denied having robbed the Family Fare.

## B. Procedural History

On 29 August 2010, a magistrate's order was issued charging Defendant with robbery with a dangerous weapon. On 24 January 2011, the Forsyth County grand jury returned a bill of indictment charging Defendant with robbery with a dangerous weapon. On 8 August 2011, Defendant filed a motion seeking to suppress certain evidence seized at the time that he was taken into custody. On 9 August 2011, Defendant filed a motion seeking to have any identification testimony delivered by Mr. Palm suppressed. Defendant's suppression motions came on for hearing before Judge Mark E. Klass at

the 9 August 2011 criminal session of the Forsyth County Superior Court. At the conclusion of this suppression hearing, Judge Klass denied Defendant's motions.

The charge against Defendant came on for trial before the trial court and a jury at the 3 October 2011 criminal session of the Forsyth County Superior Court. On 4 October 2011, the jury returned a verdict convicting Defendant of robbery with a dangerous weapon. After accepting the jury's verdict, the trial court entered a judgment sentencing Defendant to a term of sixty to eighty-one months imprisonment. Defendant noted an appeal to this Court from the trial court's judgment.

## II.  Legal Analysis

### A.  Relevant Facts

At the hearing held with respect to Defendant's suppression motions, the State notified Judge Klass that Defendant's trial counsel had previously represented Mr. Slade, whom the State intended to call as a witness at Defendant's trial. Despite the fact that Mr. Slade's name had been mentioned during the suppression hearing, he did not testify at that proceeding. Although Defendant's trial counsel indicated that he was comfortable with going forward with the suppression hearing given that Mr. Slade had not testified, he expressed "a little concern[]" because he did "possess . . . confidential information about" Mr. Slade and acknowledged "that Mr. Slade would have to give his permission." As a result, Judge Klass decided to proceed with the suppression hearing on the understanding that the issue would be revisited after the hearing was concluded while stating that he did not "see a problem," since "[t]hat's 2003[,]" since "[i]t's not in any relationship to this case[,]" and since Mr. Slade "would just be a witness for the State."

After denying both of Defendant's suppression motions, Judge Klass resumed consideration of the conflict of interest issue by suggesting that the jury selection process be commenced subject to the understanding that Mr. Slade would be questioned concerning any objection he might have to the representation of Defendant by his former counsel. However, Defendant's trial counsel expressed a concern that Defendant, in addition to Mr. Slade, would have to consent to his continued representation. At that point, Judge Klass ascertained that Defendant understood that his trial counsel had previously represented Mr. Slade in an unrelated matter and indicated the belief that the prior representation "may not be relevant." As this colloquy

between Judge Klass and Defendant was proceeding, Defendant's trial counsel interjected that, while he had consulted "the ethics manual," he "couldn't find any clear answer" and stated that he "would feel more comfortable at least making a call to the [North Carolina State Bar] and just asking them essentially does [Defendant] need to consent." In an effort to obviate the necessity for contacting the State Bar, Judge Klass inquired if Defendant had "any objection to [his trial counsel] representing [him] knowing that eight years ago he represented one of the witnesses[.]" In response, Defendant indicated that he would "have to talk it over with [his] family." At the conclusion of a fifteen minute recess, Defendant's trial counsel stated that Defendant "has said that he's concerned about the conflict of interest" and that Defendant "wanted another lawyer."

Upon learning of Defendant's concerns, Judge Klass indicated that, while he continued to believe that there was no conflict, he would allow Defendant's trial counsel to contact the State Bar. After Mr. Slade's arrival, Judge Klass ascertained from the prosecutor that Mr. Slade was willing to waive any conflict arising from his previous representation by Defendant's trial counsel and engaged in a colloquy with Mr. Slade in order to satisfy himself that Mr. Slade's waiver was knowing and voluntary.[1] In view of the fact that the State Bar did not respond to an inquiry that day, the case against Defendant was continued. On the following day, an Assistant Ethics Counsel with the State Bar advised Judge Klass via e-mail that, "[b]ecause the former client has consented, the lawyer's ability to represent the current client is not affected," so that "the current client's consent is not required for the lawyer to continue the representation."[2]

---

1. At some point on 10 August 2011, Mr. Slade executed a written waiver in which he acknowledged that his former attorney represented Defendant, that he would be called as a witness for the State at Defendant's trial, and that he "waive[d] any and all conflicts and consent[ed] to having [Defendant's trial counsel] conduct a cross examination . . . understanding that this may infringe upon [his] attorney-client privilege."

2. Although the parties have discussed in some detail the extent, if any, to which the advice provided by the State Bar was correct in light of the relevant provisions of Revised Rule of Professional Conduct 1.7 and 2003 Formal Ethics Opinion 14, we need not resolve that issue given that our responsibility is to evaluate the validity of Defendant's constitutional claim, which is a separate issue from the extent, if any, to which Defendant's trial counsel was entitled, as a matter of professional ethics, to continue to represent Defendant without obtaining an informed waiver from Defendant of the potential conflict arising from his previous representation of Mr. Slade.

At the time that the case against Defendant was called for trial on 3 October 2011, the State informed the trial court that the case had been set for trial "a couple of months ago," at which point "an issue arose regarding whether or not [Defendant's trial counsel] had to conflict out of representing [Defendant] because of at some point a couple of years ago he did represent one of the State's witnesses, Gregory Slade, on a criminal charge of failure to register;" that Judge Klass had "held it open for us to receive confirmation from the State Bar as to whether or not [Defendant's trial counsel] had a duty to withdraw;" and that Judge Klass "did receive information from the State Bar saying that if Mr. Slade executed a waiver of conflict that we were okay to proceed." In the midst of some discussion about whether a "waiver" was "in the file,"[3] the prosecutor informed the trial court that an inquiry had been made of the State Bar because Defendant "was not wanting to waive." The trial court did not, however, conduct any additional inquiry into the extent to which Defendant's trial counsel was operating under a conflict of interest or whether Defendant was willing to knowingly, intelligently, and voluntarily waive any such conflict.

### B.  Applicable Legal Principles

An individual charged with having committed a crime has a federal and state constitutional right to the effective assistance of counsel. U.S. Const. amend. VI; N.C. Const., art. I, § 23; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674, 692 (1984); *State v. Braswell*, 312 N.C. 553, 561, 324 S.E.2d 241, 247 (1985). "The right to effective assistance of counsel includes the 'right to representation that is free from conflicts of interest.' " *State v. Bruton*, 344 N.C. 381, 391, 474 S.E.2d 336, 343 (1996) (quoting *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 1103, 67 L. Ed. 2d 220, 230 (1981)). Ordinarily, in order to obtain relief from a criminal conviction on the basis of an ineffective assistance of counsel claim, the defendant must establish that he or she received deficient representation and that these deficiencies prejudiced him or her. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693; *State v. Allen*, 360 N.C. 297, 316, 626 S.E.2d 271, 286, *cert. denied*, 549 U.S. 867, 127 S. Ct. 164, 166 L. Ed. 2d 116 (2006). "However, the [United States] Supreme Court has applied a different test when the claim of ineffec-

---

3. Although the record is not entirely clear, the "waiver" that was "in the file" was probably the waiver of the conflict executed by Mr. Slade. However, given that the record clearly shows that Defendant never waived the potential conflict identified by his trial counsel, the identity of the item that the trial court observed "in the file" is immaterial to the analysis that we are required to undertake in this case.

tive assistance is based upon a conflict of interest arising out of an attorney's multiple representation of more than one defendant or party, either simultaneously or in succession, in the same or related matters," given that, "[u]nder such circumstances, questions may arise as to the attorney's loyalty to any individual client." *State v. Phillips*, 365 N.C. 103, 118, 711 S.E.2d 122, 135 (2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1541, 182 L. Ed. 2d 176 (2012).

The exact standard to be applied when evaluating what relief, if any, should be granted in response to a conflict of interest claim hinges, to a considerable extent, upon the exact procedural context in which the conflict of interest claim has been presented for a reviewing court's consideration. *State v. Choudhry*, 365 N.C. 215, 219, 717 S.E.2d 348, 352 (2011) (stating that "[t]he test to determine whether a defendant is entitled to relief under such circumstances without having to demonstrate prejudice is dependent upon the level of notice given to the trial court and the action taken by that court") (citing *Phillips*, 365 N.C. at 118–20, 711 S.E.2d 122, 135–36 (2011)). On one hand, "reversal [is] automatic when the trial court improperly forced defense counsel to represent codefendants over counsel's objection." *Phillips*, 365 N.C. at 119, 711 S.E. 2d at 136 (citing *Holloway v. Arkansas*, 435 U.S. 475, 488-91, 98 S. Ct. 1173, 1180-82, 55 L. Ed. 2d 426, 437-38 (1978)). In other words, "[i]f a defendant who objects to multiple representation is denied 'the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial,' prejudice is presumed." *Choudhry*, 365 N.C. at 220, 717 S.E 2d at 352 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 1718, 64 L. Ed. 2d 333, 346 (1980)). "[W]hen multiple representation gives rise to a conflict about which an objection has been raised, the trial court must give a defendant the opportunity to show that 'potential conflict impermissibly imperils [the defendant's] right to a fair trial.' " *Phillips*, 365 N.C. at 119, 711 S.E.2d at 136 (alteration in original) (quoting *Cuyler*, 446 U.S. at 348, 100 S. Ct. at 1718, 64 L. Ed. 2d at 346). However, " '[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.' " *Id.* at 119, 711 S.E.2d at 136 (alteration in original) (quoting *Cuyler*, 446 U.S. at 347, 100 S. Ct. at 1717, 64 L. Ed. 2d at 346). At such an inquiry, "the trial court is responsible for ensuring that the defendant fully understands the consequences of a potential or actual conflict," including "determining both whether an actual conflict exists and, if so, whether the defendant is knowingly, intelligently, and voluntarily waiving his or her rights to conflict-free representation." *Choudhry*, 365 N.C. at 223, 717 S.E 2d at 354 (citing *State v. Ballard*,

180 N.C. App. 637, 642-43, 638 S.E.2d 474, 479 (2006), *disc. review denied*, 361 N.C. 358, 646 S.E. 2d 119 (2007), and *State v. James*, 111 N.C. App. 785, 791, 433 S.E.2d 755, 758-59 (1993)). "In the absence of an objection, the trial court's failure to inquire into a conflict will not result in a reversal unless the defendant demonstrates that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Phillips*, 365 N.C. at 119, 711 S.E.2d at 136 (quoting *Cuyler*, 446 U.S. at 348, 350, 100 S. Ct. at 1718, 64 L. Ed. 2d at 346-47).[4] In the event that a "possible conflict was 'sufficiently apparent' . . . to trigger inquiry by the trial court" and no such inquiry was conducted, the case should be "remanded . . . for a hearing to determine whether a conflict actually existed." *Phillips*, 365 N.C. at 119-20, 711 S.E.2d at 136 (quoting *Wood*, 450 U.S. at 272, 101 S. Ct. at 1104, 67 L. Ed. 2d at 230-31). As a result, " 'even when a trial court 'fails to inquire into a potential conflict of interest about which it knew or reasonably should have known,' " "the defendant must still establish an actual conflict that 'adversely affected his counsel's performance.' " *Phillips*, 365 N.C. at 120, 711 S.E.2d at 136 (quoting *Mickens v. Taylor*, 535 U.S. 162, 164, 173-74, 122 S. Ct. 1237, 1239, 1245, 152 L. Ed. 2d 291, 299, 305 (2002)).

Although the facts of this case are not absolutely identical to any of those which have been previously decided by the United States Supreme Court and the Supreme Court of North Carolina, the record clearly reflects that Defendant refused to waive the potential conflict of interest identified by his trial counsel and requested to be provided with new counsel at the hearing held before Judge Klass and that the trial court was made aware of Defendant's refusal to waive the potential conflict immediately prior to the beginning of Defendant's trial.[5] Even so, neither Judge Klass nor the trial court conducted any inquiry into the nature and extent of this potential conflict or whether Defendant did, in fact, wish to knowingly, intelligently, and voluntar-

---

4. The same rule applies when "the trial court's inquiry is inadequate or incomplete." *Choudry*, 365 N.C. at 224, 717 S.E.2d at 355.

5. Although the State emphasizes that Defendant did not request the appointment of replacement counsel and that his trial counsel did not provide any additional information concerning the nature and extent of any conflict-related problems that would result from the necessity for him to cross-examine Mr. Slade when the case was called for trial, the record clearly reflects that Defendant refused to waive the conflict in the proceedings held before both Judge Klass and the trial court and requested to be provided with new counsel during the hearing held before Judge Klass. Under that set of circumstances, we do not believe that the fact that Defendant and his trial counsel did not take additional actions over and above those described in the text of this opinion has any bearing on the proper outcome in this proceeding.

ily waive it.[6] Thus, we believe that Defendant, like the defendants in *Holloway*, was effectively forced to go to trial while still represented by his trial counsel, who had previously represented one of the State's witnesses and who acknowledged being in the possession of confidential information which might be useful for purposes of cross-examining that witness, despite having clearly objected to continued representation by that attorney.[7] As a result, given that prejudice is presumed under such circumstances, Defendant is entitled to a new trial.

In seeking to persuade us to reach a different result, the State argues, in reliance upon *Choudhry*, that Defendant must show "an actual conflict of interest that adversely affected his defense counsel's performance" as a precondition for an award of appellate relief. 365 N.C. at 224. 717 S.E. 2d at 355. We do not find this logic persuasive, however, since Defendant, unlike the defendant in *Choudhry*, objected to continued representation by his trial counsel and affirmatively asked to be provided with new counsel. Thus, since the showing held necessary in *Choudhry* is only required in cases involving "defendant[s] who raised no objection at trial," *Cuyler*, 446 U.S. at 348, 100 S. Ct. at 1718, 64 L. Ed. 2d at 346, and since Defendant, contrary to the position asserted in the State's brief did object to continued representation by his trial counsel, Defendant was not required to make the showing deemed necessary by the State in order to be entitled to an award of appellate relief. As a result, since Defendant was effectively compelled to go to trial despite having objected to the potential conflict of interest under which his trial counsel labored, he is entitled to receive, and hereby does receive, a new trial.

NEW TRIAL.

Judges McGEE and STEELMAN concur.

6. The fact that Mr. Slade waived the conflict arising from his former representation by Defendant's trial counsel and consented to allowing Defendant's trial counsel to cross-examine him despite the implications of the attorney-client privilege inherent in such a cross-examination does not suffice to justify a refusal to award appellate relief in this case given that the legal rights at issue in this proceeding belonged to Defendant rather than Mr. Slade and given that Judge Klass and the trial court, who were put on notice of Defendant's refusal to waive this potential conflict of interest, did not respond to Defendant's objection by conducting an appropriate inquiry.

7. At the time that Mr. Slade testified on behalf of the State, Defendant's trial counsel cross-examined him concerning a prior statement that he had made to police, where the individual that Mr. Slade identified as Defendant had been at particular times, what the individual that Mr. Slade identified as Defendant had been wearing, and the criminal offenses of which Mr. Slade had been convicted.