IN THE SUPREME COURT OF NORTH CAROLINA

No. 356A19

Filed 18 December 2020

IN THE MATTER OF: K.M.W. and K.L.W.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 27 June 2019 by Judge Elizabeth Heath in District Court, Lenoir County. Heard in the Supreme Court on 12 October 2020.

*Robert Griffin for petitioner-appellee Lenoir County Department of Social Services.*

*Michelle FormyDuval Lynch for appellee Guardian ad Litem.*

*Annick Lenoir-Peek, Deputy Parent Defender, for respondent-appellant mother.*

ERVIN, Justice.

Respondent-mother Holly W. appeals from orders terminating her parental rights in her children K.M.W. and K.L.W.[1] After careful consideration of the arguments advanced in respondent-mother's brief in light of the record and the applicable law, we hold that the challenged termination orders should be reversed and that this case should be remanded to the District Court, Lenoir County, for further proceedings not inconsistent with this opinion, including a new termination hearing.

---

[1] K.M.W. and K.L.W. will be referred to throughout the remainder of this opinion as, respectively, "Khloe" and "Kylee," which are pseudonyms used to protect the identity of the juveniles and for ease of reading.

Khloe was born on 22 November 2012, while Kylee was born on 25 March 2008. The Duplin County Department of Social Services became involved with respondent-mother and the father[2] on 9 July 2015 after receiving a report alleging that respondent-mother—who, at the time, had custody of the children—had engaged in an incident involving domestic violence with her boyfriend in the presence of the children and had been administering medicine to the children in order to get them to sleep. An investigation into this report revealed that domestic violence had occurred, that respondent-mother had been consuming marijuana, and that respondent-mother lacked stable housing.

Following the making of this report, the children were voluntarily placed with their paternal grandparents. On 22 July 2015, respondent-mother broke down an interior door in the paternal grandparents' home, at which point the children were placed with their father and his girlfriend by the consent of all parties.

On 4 April 2016, DSS filed a petition alleging that the children were neglected juveniles. On 29 July 2016, Judge Sarah C. Seaton entered an order finding that the children were neglected juveniles. After this case was transferred from Duplin County to Lenoir County by consent of the parties following respondent-mother's move from Swansboro to Kinston, the trial court entered a dispositional order on 20 October 2015 placing the children in the joint custody of their parents, with the father

---

[2] In view of the fact that the father is not a party to the proceedings before this Court on appeal, we will refrain from discussing information particular to him throughout the remainder of this opinion.

being awarded primary physical custody and with respondent-mother having been awarded two hours of visitation each week, and requiring respondent-mother to take a number of steps in order to alleviate the conditions that had led to the finding that the children were neglected juveniles, including, but not limited to, obtaining a mental health assessment and complying with any resulting recommendations, obtaining a substance abuse assessment and complying with any resulting recommendations, participating in parental responsibility classes and demonstrating the ability to use the skills that she had learned, obtaining and maintaining stable housing and employment, participating in Family Drug Treatment Court, participating in an anger management course or counseling, and attending victim empowerment education.

A review hearing was held on 6 December 2016 at which the trial court instructed respondent-mother to refrain from making unannounced visits to the father's home. At a review hearing held on 24 January 2017, the trial court learned that respondent-mother had made unannounced appearances at the father's home on two occasions for the purpose of seeing the children. As a result, the trial court entered an order granting custody of the children to the father; allowing respondent-mother to have unsupervised visitation with the children every other weekend and every Wednesday evening; ordering respondent-mother to abide by many of the same corrective conditions that she had previously been ordered to comply with and the additional condition that respondent-mother refrain from having men in her home

when the children were present; and removing this case from the active review docket, subject to the understanding that the court remained available to hear any matter that any party might elect to raise in the future.

After the entry of the 24 January 2017 order, DSS learned that, despite the trial court's prior order, respondent-mother had had a male friend in her home while the children were present and that respondent-mother's male friend had allegedly sexually abused Khloe while in respondent-mother's home. After refusing to participate in a Safety Assessment, respondent-mother violated a Safety Assessment that had been entered into by the father by allowing Khloe to speak on the phone with the alleged perpetrator. Following this conversation, Khloe recanted her accusation of sexual abuse against respondent-mother's male friend and subsequently told respondent-mother that the father had touched her "pee-pee."

A second petition alleging that the children were neglected juveniles was filed by the Lenoir County Department of Social Services on 17 May 2017, with James Perry having been appointed to represent respondent-mother in this matter. On 16 November 2017, the trial court entered an order finding that Khloe and Kylee were neglected juveniles and putting the children in DSS custody; approving the placement of the children with their maternal grandparents; terminating respondent-mother's visitation with the children until the children and respondent-mother had begun therapy; and ordering respondent-mother to obtain a mental health assessment and comply with any resulting recommendations, obtain a substance abuse assessment

and comply with any resulting recommendations, attend and participate in parenting responsibility classes and demonstrate the ability to use the skills that she had learned in those classes, obtain and maintain stable housing and employment, submit to random drug testing, attend and participate in a victim empowerment class or address such issues in counseling, and refrain from having any contact with her male friend.

After a review hearing was held on 14 November 2017, the trial court entered an order on 30 January 2018 relieving DSS from any obligation to attempt to reunify respondent-mother with the children and refusing to allow respondent-mother to visit the children in the absence of a recommendation that such visitation be authorized by the children's therapist. After a permanency planning hearing held on 12 December 2017, the trial court entered an order eliminating reunification with the parents from the children's permanent plan and changing the children's permanent plan to a primary plan of guardianship and a secondary plan of custody with a relative or other suitable person. In addition, the trial court noted that the children's therapist's was recommending that respondent-mother have no contact with the children, ordered that respondent-mother not be allowed to visit with the children until such contact was recommended by the children's therapist and approved by the trial court, and authorized respondent-mother to contact the therapist in order to provide the therapist with respondent-mother's perspective.

After a permanency planning review hearing held on 15 May 2018, the trial court entered an order on 8 June 2018 in which it reiterated that the current permanent plan for the children remained a primary plan of guardianship and a secondary plan of custody with a relative or other suitable person. In addition, the trial court noted that the children's therapist continued to recommend that respondent-mother have no contact with the children, pointed out that the therapist's recommendation was bolstered by respondent-mother's failure to comply with prior orders of the court, and reiterated that respondent-mother might be able to visit with the children in the future in the event that such visits were recommended by the children's therapist and approved by the trial court. Perhaps most importantly, the trial court acknowledged that the maternal grandparents were no longer interested in serving as a long-term placement for the children and pointed out that DSS had identified respondent-mother's cousins by marriage as a prospective placement for the children.

On 30 August 2018, the trial court entered a permanency planning order in which it authorized the placement of the children with respondent-mother's cousins by marriage, changed the permanent plan for the children to a primary plan of adoption and a secondary plan of guardianship, and ordered DSS to file a petition seeking to have the parents' parental rights in the children terminated. After a permanency planning hearing held on 20 November 2018, the trial court entered an order on 2 January 2019 in which it observed, among other things that, while

respondent-mother had recently begun to comply with her case plan, she "ha[d] not adequately addressed issues of domestic violence, housing stability, unemployment, substance abuse, and mental health concerns in the years that she has been involved with [DSS.]"  As a result of the fact that the trial court had scheduled another permanency planning review hearing for 16 April 2019, counsel for DSS served a copy of the 2 January 2019 order upon Mr. Perry on 7 January 2019.

On 21 December 2018, DSS filed petitions seeking to have both parents' parental rights in Khloe and Kylee terminated on the basis of neglect, N.C.G.S. § 7B-1111(a)(1) (2019), and willful failure to make reasonable progress toward correcting the conditions that had led to the children's removal from the family home, N.C.G.S. § 7B-1111(a)(2).  On 3 January 2019, Mr. Perry filed a motion seeking leave to withdraw as respondent-mother's counsel in light of her decision to retain privately-employed counsel using funds derived from a back payment that she had received in connection with a recent SSI award.

At a hearing held on 8 January 2019, respondent-mother confirmed in the presence of the trial court that she wished to retain privately-employed counsel and to waive her right to the assistance of court-appointed counsel.  In the course of this hearing, Mr. Perry indicated that his motion was specific to the termination of parental rights case and that he intended to "stay in the other one until its

completed."[3]  At the conclusion of the hearing, respondent-mother signed a waiver of counsel form indicating that she "[did] not want a court-appointed lawyer" and "[would] hire [her] own lawyer at [her] own cost."

After the trial court entered an order on 9 January 2019 allowing Mr. Perry's withdrawal motion, respondent-mother retained Roy Dawson to represent her in the termination of parental rights proceeding.  On 13 February 2019, Mr. Dawson filed verified answers on respondent-mother's behalf in which she denied the material allegations of the termination petitions and requested that those be denied.

On 25 March 2019, respondent-mother made an unannounced visit to the residence of her cousins by marriage for the purpose of requesting to be allowed to see the children and to deliver certain gifts to them.  As a result of this violation of prior court orders, the guardian *ad litem* filed a motion on 8 April 2019 requesting that an order be entered requiring respondent-mother to show cause why she should not be held in contempt.

A permanency planning review hearing was held on 16 April 2019, at which Mr. Perry appeared while respondent-mother did not.  The trial court noted in a subsequent order that respondent-mother had been notified of the 16 April 2019 hearing both in writing and during the 20 November 2018 hearing.  In light of the fact that respondent-mother had not been in contact with Mr. Perry since 20

---

[3] The "other case" to which Mr. Perry made reference was the underlying neglect proceeding.

November 2018, the trial court concluded that Mr. Perry should be relieved of his appointment as respondent-mother's counsel in the underlying neglect proceeding. On the same date, the trial court entered an order requiring respondent-mother to appear on 30 April 2019 and show cause why she should not be held in contempt.

On 30 April 2019, the trial court held a hearing for the purpose of addressing the show cause motion. In light of her belief that the show cause hearing involved a criminal, rather than a civil, proceeding, respondent-mother initially appeared in criminal district court. After Mr. Perry located respondent-mother and brought her to the correct courtroom and after he explained "what was going on and what her options were," respondent-mother left the courtroom. At Mr. Perry's request, the trial court continued the show cause hearing until 14 May 2019 so that respondent-mother could discuss her situation with Mr. Dawson. Later that day, however, Mr. Dawson filed motions seeking leave to withdraw as respondent-mother's counsel in the termination proceedings. Although the withdrawal motions were served upon counsel for DSS, they do not appear to have been served upon respondent-mother.

On 14 May 2019, the issues arising from Mr. Dawson's withdrawal motion and the show cause motion came on for hearing before the trial court in respondent-mother's absence. At the hearing, Mr. Dawson informed the trial court that he had been "requested to withdraw by [respondent-mother]" and that, while he "ha[d] attempted to secure [respondent-mother's] presence in court today for this," he had "been unable to do so." As a result, Mr. Dawson asked that he be allowed to withdraw

from his representation of respondent-mother in the termination of parental rights proceedings, a request that the trial court granted without further inquiry. In addition, after finding respondent-mother in contempt, the trial court continued the disposition of that matter until 11 June 2019. Mr. Dawson served the trial court's order allowing his withdrawal motion upon respondent-mother on 15 May 2019.

A notice that a termination of parental rights hearing had been set for 9:00 a.m. on 11 June 2019, which noted that respondent-mother's attorney had been discharged, was served on respondent-mother by first-class mail on 21 May 2019. At the time that the termination petitions were called for hearing at 9:24 a.m. on 11 June 2019, respondent-mother was not present. In response to the trial court's inquiry concerning whether DSS had been able to determine whether respondent-mother lived at the address to which the notice of hearing had been sent, counsel for DSS responded that "[w]e don't have any new information about that," that "[t]hat [address] was where [Mr.] Dawson said that [respondent-mother] lived," and that the address in question was "the address that we've been using for processing."

At 9:40 a.m., after a social worker had begun testifying, respondent-mother entered the courtroom. The trial court did not, however, make any inquiry of respondent-mother concerning whether she was represented by counsel, whether she wished to have counsel appointed, or whether she wished to represent herself. After respondent-mother objected to certain testimony given by the social worker on the grounds that the testimony in question was untrue, the trial court overruled

-10-

respondent-mother's objection. Once the direct examination of the social worker had been completed, the trial court allowed respondent-mother to cross-examine the social worker. Subsequently, the trial court allowed respondent-mother to testify on her own behalf and to make a closing argument concerning the issue of whether grounds existed to support the termination of her parental rights in the children.

After announcing its decision that grounds for terminating respondent-mother's parental rights in the children existed, the trial court proceeded to the dispositional phase of the proceeding and informed respondent-mother that she would be able to present dispositional evidence if she wished to do so. Almost immediately after the beginning of the dispositional hearing, respondent-mother left the courtroom "without any conversation with the [trial court] about what her position [was], or where she[ ] [was] going, or whether she intend[ed] to come back." Approximately fifteen minutes later, once the presentation of dispositional evidence had concluded, respondent-mother re-entered the courtroom and apologized to the trial court for her departure, stating that "I know it was disrespectful, but this is just a lot—a lot for any parent, I hope, that loves their kids to try and take in at once because I love my kids and it's just hard to hear all this.." At the conclusion of the dispositional proceeding, the trial court announced that respondent-mother's parental rights in the children would be terminated and that no punishment would be imposed upon respondent-mother in the contempt proceeding.

On 27 June 2019, the trial court entered an order determining that respondent-mother's parental rights in the children were subject to termination on the basis of both of the grounds for termination alleged in the termination petition, that the termination of respondent mother's parental rights would be in the children's best interests, and that respondent-mother's parental rights in the children had been terminated. On 27 June 2019, the trial court entered an order providing that no punishment be imposed upon respondent-mother for her contemptuous conduct. Respondent-mother noted an appeal to this Court from the trial court's termination orders.

In seeking relief from the trial court's termination orders before this Court, respondent-mother argues that the trial court had erred by allowing her retained counsel to withdraw without proper notice and by allowing her to proceed *pro se* at the termination hearing without making proper inquiry into the issue of whether she wished to be represented by counsel. In respondent-mother's view, "[t]he record in this case does not show that [she] received any notice from [Mr. Dawson] that counsel would seek to withdraw from her representation" in light of the fact that "[n]o certificates of service, subpoenas, or copies of correspondence confirm that [respondent-mother] was notified of the motion prior to the hearing," citing *In re M.G.*, 239 N.C. App. 77, 83, 767 S.E.2d 436, 441 (2015) (concluding that the respondent's right to counsel had been violated in a situation in which the respondent had no prior notice of her attorney's intent to withdraw and had not been present at

the termination hearing), with Mr. Dawson's representations to the trial court that he had attempted to secure respondent-mother's presence "not [being] evidence," citing *In re D.L.*, 166 N.C. App. 574, 582, 603 S.E.2d 376, 382 (2004) (noting that "[s]tatements by an attorney are not considered evidence"). In addition, respondent-mother asserts that she had not been given notice "that either appointed or retained counsel sought to withdraw" in either "hearing where counsel was relieved," citing *In re D.E.G.*, 228 N.C. App. 381, 383–87 & n.3, 747 S.E.2d 280, 282–85 & n.3 (2013) (concluding that the respondent's right to counsel had been violated given the absence of any indication that the respondent had prior knowledge that his or her attorney intended to move to withdraw, that the respondent had not been present for the termination hearing, that the respondent had only been released from prison four days earlier, and that the respondent's counsel, rather than appearing in person, had counsel for DSS relay to the trial court that he had not heard from his client and wished to withdraw). As a result, respondent-mother contends that "[i]t was error for the trial court to relieve both attorneys."

In addition, respondent-mother asserts that the trial court failed to make proper inquiry concerning whether respondent-mother wished to waive counsel entirely. Respondent-mother asserts that, when accepting her waiver of court-appointed counsel, "the [trial court] did not indicate that this would preclude her from obtaining appointed counsel later if she still qualified," that "no one understood the waiver to mean that [respondent-mother] would at any point wish to proceed *pro se*,"

and that, "when she signed the waiver [form], everyone understood that it was with the intention of hiring counsel, not proceeding *pro se*." According to respondent-mother, "[t]here was never an inquiry of any kind" concerning whether respondent-mother was " 'act[ing] with full awareness of [her] rights and of the consequences of the waiver,' " quoting North Carolina Office of Indigent Defense Services Rule 1.6 (2015), with respondent-mother never having been "informed by the trial court that she had the right to receive appointed counsel even after her retained counsel withdrew."

Respondent-mother also argues that "the trial court [never] inquire[d] whether [Mr. Dawson's withdrawal] was related to a difference of opinion or due to fees owed, what 'attempts' were made to notify [respondent-mother] of the hearing, and whether [Mr. Dawson] explained to [respondent-mother] that she had the right to re-apply for court appointed counsel." In respondent-mother's view, "the trial court could not have interpreted [her] waiver as a waiver of her right to counsel," citing *In re S.L.L.*, 167 N.C. App. 362, 365 605 S.E.2d 498, 500 (2004) (concluding that "the trial court erred by equating respondent's request for new counsel with a waiver of court-appointed counsel, and requiring respondent to proceed to trial *pro se*"). After noting that N.C.G.S. § 7B-1101.1(a) provides that "[t]he court may reconsider a parent's eligibility and desire for appointed counsel at any stage of the proceeding," respondent-mother contends that the trial court "should have stopped the

proceedings" when respondent-mother appeared at the termination hearing in order "to inquire whether [she] had counsel or wished to proceed *pro se*."

As a result of the fact that she did not have counsel during the termination hearing, respondent-mother claims that she was unable to adequately defend herself at the termination hearing. After pointing out that "[l]awyers know the legal standard and what evidence is necessary to present to a court to defeat termination grounds," respondent-mother asserts that she "had no realistic chance of defeating a termination hearing without demonstrating," using adequate documentation, "that she was compliant with the court's orders and had remedied the reason the girls came into care" and that, in order to make such a showing, "[s]he would have needed to be familiar with our rules of evidence and the burdens of proof," citing N.C.G.S. § 7B-1109(f). As an example, respondent-mother argues that, in spite of the fact that "she testified that she was still engaged in her mental health services, the trial court asked for documentation" which respondent-mother failed to provide, a deficiency that resulted in the trial court's finding that, "[b]ased on the years of noncompliance by [respondent-mother] with court orders for reunification, the court cannot find that she has addressed domestic violence, mental health, and substance abuse concerns without any third-party verification or documentation, which [respondent-mother] did not offer."

In urging us to uphold the trial court's termination orders, DSS argues that, "[u]ntil she walked in while the hearing on termination of parental rights was in

progress on 11 June 2019," respondent-mother "had not been in the courtroom during a time that her case was being heard since 8 January 2019, a period in excess of five months." In view of the fact that respondent-mother had absented herself from the courtroom for such a lengthy period of time, DSS contends that "there was no opportunity to advise [respondent-mother] about this because she would not come to court in a timely fashion" and argues that, had respondent-mother "shown up at 9:00 [a.m.] as directed, the court could have inquired about an attorney at the pre-trial hearing." According to DSS, "[e]ven [respondent-mother] does not argue that the [trial court] should have stopped the testimony while the hearing was underway to inquire whether or not she wished to have counsel re-appointed," with such a step being "the only way to make this happen." In DSS's view, "[t]o adopt [respondent-mother's] position . . . would be to endorse the proposition that a parent can disregard notices, deadlines, and rules of court by walking into a [termination] hearing which is underway and expect that she can bring the proceeding to a halt in the middle of testimony."

In addition, DSS points out that Mr. Dawson had informed the trial court that he had unsuccessfully "attempted to secure [respondent-mother's] presence in court" for his withdrawal motion and that the trial court had found that adequate notice of the making of that motion had been given to the parties. According to DSS, the reported decisions involving the right to counsel in termination of parental rights cases all "involve[ ] situations where the parent failed to appear for the [termination]

hearing and the parent's attorney moved to withdraw without notice to the parent of their intention to withdraw." In this case, however, both of respondent-mother's attorneys sought leave to withdraw "well in advance of the [termination] hearing specifically at the request of [respondent-mother]." For that reason, DSS asserts that "[f]undamental fairness did not require the [trial court] to inquire whether [respondent-mother] had been notified of the specific date of hearing her attorney's motion to withdraw when the motion was being made at her request," citing *In re M.G.*, 239 N.C. App. at 83, 767 S.E.2d at 441; *In re D.E.G.*, 228 N.C. App. at 381, 747 S.E.2d at 280; *In re T.E.G.*, 2018 WL 4201263, at \*7 (N.C. Ct. App. 2018) (unpublished); and *In re A.D.S.*, 2019 WL 1283851, at \*12–13 (N.C. Ct. App. 2019) (unpublished).

Finally, DSS contends that Mr. Dawson's statements to the trial court that he had attempted to get respondent-mother to come to court for his withdrawal motion hearing are "his own" statements rather than a summary of statements describing information in the possession of others. DSS argues that, in view of the fact that attorneys are "officer[s] of the court," "[t]here is no requirement that he or she be sworn before offering information about the client's absence from court."

The guardian *ad litem* argues that, "[a]fter she chose to retain counsel, [respondent-mother] did not qualify for appointed counsel as she was not indigent" due to her SSI disability back payment in the amount of $7,440," so that "the trial court had no duty to inquire as to her representing herself *pro se* or appoint counsel

for her in the [termination] proceeding," citing N.C.G.S. § 7B-1101.1(a1) for the proposition that an inquiry into a parent's indigence is only necessary when "[a] parent qualifying for appointed counsel" requests to proceed without the assistance of counsel. "Alternatively," according to the guardian *ad litem*, "if [respondent-mother] did have [a] right to counsel after her retained counsel withdrew at her request, she waived or forfeited that right by her actions."

In spite of the fact that she had notice of Mr. Dawson's withdrawal motion and of the date and time at which the termination hearing would be held, the guardian *ad litem* notes that respondent-mother made no effort to request the appointment of counsel when she arrived at the termination hearing. Moreover, the guardian *ad litem* asserts that respondent-mother's late arrival at the termination hearing constituted a "failure to appear," citing *Brenda D. v. Department of Child Safety, Z.D.*, 243 Ariz. 437, 440, 410 P.3d 419, 422, (2018).[4] The guardian *ad litem* contends that, when taken together, these actions constitute "willful conduct result[ing] in her waiver and forfeiture of the right to counsel," citing *State v. Montgomery*, 138 N.C. App. 521, 525, 530 S.E.2d 66, 69 (2000) (concluding that the defendant had forfeited his right to counsel given that he "was twice appointed counsel as an indigent";

---

[4] As respondent-mother correctly notes in her reply brief, the Arizona Supreme Court held in *Brenda D. v. Department of Child Safety, Z.D.*, that, while the rights to be present, participate, and testify may be waived by a parent's failure to appear at the hearing, "[t]hese waiver rules . . . do not apply to a parent's right to counsel at a termination adjudication hearing, a right that is unaffected by the parent's appearance or absence." 243 Ariz. at 440, 410 P.3d at 422.

released those attorneys from their representation of him in order to retain private counsel; was disruptive in the courtroom on two occasions, resulting in a delay in the trial proceedings; and assaulted his attorney, resulting in further delay, on the grounds that "[s]uch purposeful conduct and tactics to delay and frustrate the orderly processes of our trial courts simply cannot be condoned"); and *In re R.R.*, 180 N.C. App. 628, 636, 638 S.E.2d 502, 507 (2006) (concluding that the respondent had waived his right to counsel given that he had failed to apply for court appointed counsel prior to the termination hearing and failed to appear at the hearing).

The guardian *ad litem* contends that, once respondent-mother retained Mr. Dawson to represent her, "she had the burden to show a change in the desire for appointed counsel," citing *State v. Hyatt*, 132 N.C. App. 697, 700, 513 S.E.2d 90, 93 (1999), with "the stringent statutory requirements of inquiry by the trial court when a [criminal] defendant waives counsel" being inapplicable to "parents in [termination of parental rights] proceedings," citing *In re P.D.R.*, 365 N.C. 533, 538, 723 S.E.2d 335, 338 (2012). According to the guardian *ad litem*, the facts of this case are distinguishable from those at issue in *In re S.L.L.*, which involved a parent who asked that his counsel withdraw *and* that the trial court appoint new counsel, citing 167 N.C. App. at 364, 605 S.E.2d at 499. In the guardian *ad litem*'s view, "[respondent-mother's] late appearance at the hearing did not cure her waiver of counsel or transfer the burden onto the trial court," with "[t]he trial court [being unable to] 'restart' the hearing due to [respondent-mother's] tardiness."

In addition, the guardian *ad litem* argues that "the trial court did not commit an abuse of discretion in allowing retained counsel to withdraw."[5]  More particularly, the guardian *ad litem* contends that "[respondent-mother's] counsel was not required to formally serve her with the motion to withdraw" given that N.C.G.S. § 1A-1, Rule 5, which governs the service of motions, is not applicable to withdrawal motions, which require "no more than 'adequate' or 'reasonable' notice to the client," citing *Hensgen v. Hensgen*, 53 N.C. App. 331, 335, 280 S.E.2d 766, 769 (1981); *Perkins v. Sykes*, 233 N.C. 147, 152–53, 63 S.E.2d 133, 137–38 (1951); and *Trust Co. v. Morgan-Schultheiss and Poston v. Morgan-Schultheiss*, 33 N.C. App. 406, 414, 235 S.E.2d 693, 697–98 (1978).  According to the guardian *ad litem*, Mr. Dawson's representations to the trial court that respondent-mother had asked him to withdraw amply demonstrated that respondent-mother "had adequate and reasonable notice" that he intended to seek leave to withdraw from his representation of respondent-mother given that trial courts "should be able to reasonably consider the statements of counsel in regards to notice to a client in a motion to withdraw," citing *Baker v. Varser*, 240 N.C. 260, 267, 82 S.E.2d 90, 95 (1954); Rule 3.3 of the N.C. Rules of

---

[5] Although the guardian *ad litem* asserts that the lawfulness of the trial court's decision to allow Mr. Dawson to withdraw is not properly before the Court given respondent-mother's failure to note an appeal from that order, citing *Von Ramm v. Von Ramm*, 99 N.C. App. 153, 156–57, 392 S.E.2d 422, 424 (1990), and N.C. R. App. P. 3(d), respondent-mother correctly notes in her reply brief that the trial court's order allowing Mr. Dawson's withdrawal was not independently appealable pursuant to N.C.G.S. § 7B-1001, so that any challenge to that order had to be brought as part of her appeal from the trial court's termination orders.

Professional Conduct; and *State v. Choudhry*, 365 N.C. 215, 223, 717 S.E.2d 348, 354 (2011). In the event that this Court concludes that the trial court failed to make "specific findings regarding notice to [respondent-mother]" of Mr. Dawson's withdrawal motion, the guardian *ad litem* requested "the [C]ourt [to] remand this matter in order that the trial court may do so."

Finally, the guardian *ad litem* contends that, even if the trial court erred by allowing Mr. Dawson to withdraw or failing to inquire into the issue of whether new counsel should be appointed, any such error was harmless. The guardian *ad litem* suggests that, even though errors implicating constitutional rights are ordinarily presumed to be prejudicial, "at least one . . . appellate court has held that the erroneous deprivation of counsel at a [termination] proceeding can be subject to a harmless error analysis," citing *In re McBride*, 483 Mich. 1095, 766 N.W.2d 857 (2009). In the guardian *ad litem*'s view, any error that the trial court might have committed in this case was harmless given that "[a]n attorney could not have cured her failure to bring documentation to the hearing" or "changed the court's findings as to grounds for the [termination of parental rights] and the best interests determination" in light of respondent-mother's extensive child protective services history, her repeated failure to comply with her case plan and various orders of the court, her refusal to believe Khloe's claim that she had been sexually abused by respondent-mother's male friend, and the fact that the children had not been placed with respondent-mother since 2015 or visited with her since 2017.

According to well-established federal and North Carolina law, "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures," *In re Murphy*, 105 N.C. App. 651, 653, 414 S.E.2d 396, 397–98, *aff'd per curiam*, 332 N.C. 663, 422 S.E.2d 577 (1992) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 71 L.Ed.2d 599, 606 (1982)), with the existence of such procedures being an inherent part of the State's efforts to protect the best interests of the affected children by preventing unnecessary interference with the parent-child relationship. N.C.G.S. § 7B-100(4) (stating that one of the purposes of the relevant statutory provisions is to "prevent[ ] the unnecessary or inappropriate separation of juveniles from their parents"). In order to adequately protect a parent's due process rights in a termination of parental rights proceeding, the General Assembly has created a statutory right to counsel for parents involved in termination proceedings. More specifically, N.C.G.S. § 1101.1(a) provides that "[t]he parent [in a termination of parental rights proceeding] has the right to counsel, and to appointed counsel in cases of indigency, unless the parent waives the right." Although parents eligible for the appointment of counsel in termination of parental rights proceedings may waive their right to counsel, they are entitled to do so only "after the court examines the parent and makes findings of fact sufficient to show that the waiver is knowing and voluntary." N.C.G.S. § 7B-1101.1(a1).

Consistently with the provisions of N.C.G.S. §7B-1101.1(a1), Rule 16 of the General Rules of Practice prohibits an attorney from withdrawing from his or her

representation of a client in the absence of "(1) justifiable cause, (2) reasonable notice to the client, and (3) the permission of the court." N.C. Gen. R. Pract. Super. and Dist. Ct. 16. As the Court of Appeals has correctly held, a trial court's decision concerning whether to allow the withdrawal of a parent's counsel in a termination of parental rights proceeding is discretionary in nature, with any such decision being subject to reversal on appeal only in the event that the trial court's ruling constitutes an abuse of discretion. *Benton v. Mintz*, 97 N.C. App. 583, 587, 389 S.E.2d 410, 412 (1990) (citing *Brown v. Rowe Chevrolet-Buick, Inc.*, 86 N.C. App. 222, 357 S.E.2d 181 (1987)). "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *In re J.H.*, 373 N.C. 264, 268, 837 S.E.2d 847, 850 (2020) (quoting *In re N.G.*, 186 N.C. App. 1, 10–11, 650 S.E.2d 45, 51 (2007)). However, this "general rule presupposes that an attorney's withdrawal has been properly investigated and authorized by the court," so that, "[w]here an attorney has given his client no prior notice of an intent to withdraw, the trial judge has no discretion." *Williams & Michael, P.A. v. Kennamer*, 71 N.C. App. 215, 217, 321 S.E.2d 514, 516 (1984).

Although a waiver of counsel, generally speaking, requires a knowing and intentional relinquishment of that right, *State v. Thomas*, 331 N.C. 671, 673–74, 417 S.E.2d 473, 475–76 (1992), "the trial court is not required to abide by the . . . directive to engage in a colloquy regarding a knowing waiver" where the litigant has forfeited his right to counsel by engaging in "actions [which] totally undermine the purposes

of the right itself by making representation impossible and seeking to prevent a trial from happening at all." *State v. Simpkins*, 373 N.C. 530, 536–38, 838 S.E.2d 439, 446–47 (N.C. 2020). However, "[a] finding that a defendant has forfeited the right to counsel" has been restricted to situations involving "egregious dilatory or abusive conduct on the part of the [litigant]." *Id.* at 541, 838 S.E.2d at 449. A trial court's determination concerning whether a parent has waived his or her right to counsel is a conclusion of law that must be made in light of the statutorily prescribed criteria, so we review the question of whether the trial court erroneously determined that a parent waived or forfeited his or her statutory right to counsel in a termination of parental rights proceeding using a *de novo* standard of review. *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019) (citing *In re S.N.*, 194 N.C. App. 142, 146, 669 S.E.2d 55, 59 (2008), *aff'd per curiam*, 363 N.C. 368, 677 S.E.2d 455 (2009)).

After examining the unique circumstances that occurred in this case, we conclude that the trial court erred by allowing Mr. Dawson's motion to withdraw from his representation of respondent-mother and permitting respondent-mother to represent herself at the termination hearing without ensuring that she had knowingly and voluntarily waived her right to the assistance of counsel. Admittedly, the Court of Appeals has correctly held on a number of occasions that attorneys were properly allowed to withdraw from their representation of a parent in a termination proceeding in instances in which the parent failed to appear at scheduled proceedings or to maintain contact with his or her counsel, *see, e.g.*, *In re M.G.*, 239 N.C. App. at

77, 767 S.E.2d at 436; *In re D.E.G.*, 228 N.C. App. at 381, 747 S.E.2d at 280; *In re K.N.*, 181 N.C. App. 736, 741, 640 S.E.2d 813, 817 (2007), in light of the fact that "a lawyer cannot properly represent a client with whom [he or she] has [had] no contact." *Dunkley v. Shoemate*, 350 N.C. 573, 578, 515 S.E.2d 442, 445 (1999). However, these decisions also recognize that, "before allowing an attorney to withdraw or relieving an attorney from any obligation to actively participate in a termination of parental rights proceeding when the parent is absent from a hearing, the trial court must inquire into the efforts made by counsel to contact the parent in order to ensure that the parent's rights are adequately protected." *In re D.E.G.*, 228 N.C. App. at 386–87, 747 S.E.2d at 284 (2013) (citing *In re S.N.W.*, 204 N.C. App. 556, 698 S.E.2d 76 (2010)).

For example, in *In re M.G.*, while DSS sent "notice of the date, time, and location of the [termination] hearing to [r]espondent" at her last known address, the parent contended that she never received the notice that had been mailed to her. 239 N.C. App. at 80, 767 S.E.2d at 439. After the respondent failed to appear at the termination hearing, the trial court allowed the parent's attorney to withdraw given that "the [r]espondent was served but has failed to appear." *Id.* at 81–82, 767 S.E.2d at 440. Following the allowance of the withdrawal motion, the parent's attorney neither participated in nor presented any evidence on the parent's behalf at the termination hearing. *Id.* After determining that the record was "devoid of any evidence whatsoever that [r]espondent received any notice from her trial counsel that

counsel would seek to withdraw from her representation at the start of the [termination] hearing," *id.* at 84, 767 S.E.2d at 441, the Court of Appeals vacated the trial court's termination order on the grounds that it "ha[d] consistently vacated or remanded [termination] orders when questions of 'fundamental fairness' have arisen due to failures to follow basic procedural safeguards." *Id.* at 83, S.E.2d at 441.

A careful examination of the record that has been presented for our review in this case indicates that neither the certificate of service attached to Mr. Dawson's withdrawal motion nor any related correspondence shows that respondent-mother was served with a copy of the withdrawal motion prior to the date upon which Mr. Dawson was allowed to withdraw. On the contrary, the certificate of service attached to Mr. Dawson's withdrawal motion appears to reflect that the only party upon whom that motion was served was DSS. Although Mr. Dawson told the trial court that respondent-mother had "requested" that he withdraw from his representation of her and that he had "attempted to secure [respondent-mother's] presence in court" at the time that his withdrawal motion was heard, the trial court does not appear to have made any inquiry into whether respondent-mother had been served with the withdrawal motion; whether Mr. Dawson had informed respondent-mother that he intended to move to withdraw on that date; why respondent-mother had requested Mr. Dawson to withdraw, including whether his withdrawal motion resulted from respondent-mother's inability to pay for his services; and what efforts Mr. Dawson had made to ensure that respondent-mother understood the implications of the action

that he proposed to take or to protect her statutory right to the assistance of counsel. As a result, given the very limited inquiry that the trial court undertook before allowing Mr. Dawson's withdrawal motion, we conclude that the trial court erred by allowing that motion.

In addition, we hold that, even if the trial court did not err by allowing Mr. Dawson's withdrawal motion, it erred by allowing respondent-mother to represent herself at the termination hearing without making adequate inquiry into the issue of whether she wished to appear *pro se*. As the record clearly reflects, the waiver of counsel form that respondent-mother completed at the time that Mr. Perry was allowed to withdraw from his representation of respondent-mother in the termination proceeding was intended to facilitate her employment of privately-retained counsel and did not constitute a waiver of her right to any and all counsel. On the contrary, a careful examination of the waiver of counsel form that respondent-mother completed reflects that respondent-mother checked the box relating to a waiver of her right to court-appointed counsel and did not check the box stating that "I do not want the assistance of any lawyer. I understand that I have the right to represent myself, and that is what I intend to do." For that reason, the record amply demonstrates that respondent-mother had generally wished to be represented by counsel, had been represented by counsel in the termination proceeding until the allowance of Mr. Dawson's withdrawal motion, and had never expressed the intention of representing herself. In light of that set of circumstances, we believe that the trial court had an

obligation to make inquiry of respondent-mother concerning the issue of whether she wished to represent herself at the time that she made her tardy appearance at the termination hearing as required by N.C.G.S. § 7B-1101.1(a1).

Admittedly, respondent-mother did not ask the trial court to conduct an inquiry into the issue of whether she wished to represent herself or desired to request the appointment of counsel following her tardy arrival at the termination hearing. On the other hand, nothing in the record suggests that respondent-mother knew that she had the right to do so or that the trial court informed her that such an option was available. The fact that respondent-mother had been represented by counsel at the underlying juvenile proceeding and had been provisionally appointed counsel to represent respondent-mother in the termination proceeding provides ample basis for believing that respondent-mother was indigent at the beginning of the termination proceeding.[6] In addition, the fact that respondent-mother was able to retain counsel as the result of a one-time increase in her income and the fact that the financial status of litigants can change over time suggests that it would have been appropriate for the trial court to have made further inquiry into the issue of whether respondent-mother was indigent and wished to be represented by court-appointed counsel following the allowance of Mr. Dawson's withdrawal motion. At an absolute minimum, given that respondent-mother had never waived the right to all counsel, the trial court violated

---

[6] We note that the record on appeal presented for our consideration in this case does not contain any affidavit of indigency that had been executed by respondent-mother during the course of the trial court proceedings.

N.C.G.S. § 7B-1101.1(a1) by allowing respondent-mother to represent herself at the termination hearing without having "examin[ed] [respondent-mother] and mak[ing] findings of fact sufficient to show that" respondent-mother "knowing[ly] and voluntary[ily]" wished to appear *pro se.*

Although respondent-mother's level of engagement with the proceedings before the trial court in connection with this termination proceeding was certainly less than exemplary, nothing in respondent-mother's conduct had the repeatedly disruptive effect necessary to  constitute the "egregious" conduct that is required to support a determination that respondent-mother had forfeited her statutory right to counsel. *Simpkins*, 373 N.C. at 535, 838 S.E.2d at 446.  Simply put, this is not a case in which a respondent-parent has acted to delay or disrupt the proceedings in such a manner as to work a forfeiture of the right to counsel.  As a result, in addition to rejecting the argument that respondent-mother waived her right to counsel in a valid manner, we reject the guardian *ad litem*'s contention that she forfeited her right to counsel by engaging in serious misconduct.[7]

---

[7] Similarly, we are not inclined to hold that respondent-mother waived her right to the assistance of counsel based upon her less-than-stellar record for attending court. Assuming, without in any way deciding, that such an implicit waiver is possible despite our admonition that a waiver of the right to the assistance of counsel involves a knowing and intentional relinquishment of that right, *Thomas*, 331 N.C. at 673–74, 417 S.E.2d at 475–76, we are unable to interpret respondent-mother's conduct as being sufficient to support a finding of implied waiver given her prior invocation of the right to counsel; the fact that she had consistently had the assistance of counsel throughout the underlying abuse, neglect, and dependency proceeding; the lack of any explanation for her request that Mr. Dawson withdraw from his representation of her in the termination proceeding; and the fact that respondent-mother had not previously failed to appear in the termination proceeding.  In our

Finally, we decline to adopt the guardian *ad litem*'s suggestion that we require a showing of prejudice as a prerequisite for obtaining an award of appellate relief in cases involving the erroneous deprivation of the right to counsel. In the criminal context, no showing of prejudice is required in instances like this one, *see, e.g., State v. Colbert*, 311 N.C. 283, 286, 316 S.E.2d 79, 81 (1984), and we decline to adopt a different rule for use in termination of parental rights proceedings. *See, e.g., In re D.E.G.*, 228 N.C. App. at 388 n.6, 747 S.E.2d at 285 (declining an invitation by DSS and the guardian *ad litem* to "uphold the termination order on non-prejudice grounds" in light of "the absence of any information tending to show the extent, if any, to which [the respondent's] trial counsel attempted to contact [the respondent] prior to the hearing in question"); *In re N.T.S.*, 2011 WL 3891795, at *4 (N.C. App. Ct. 2011) (unpublished) (stating that, "given the fundamental nature of the right to counsel in juvenile abuse, neglect, and dependency cases, our cases have not required parents to demonstrate prejudice in order to obtain appellate relief based upon a violation of their right to counsel"). Aside from the fact that the effect of such a deprivation upon a parent involved in a termination proceeding can be quite significant, it is simply impossible for a reviewing court to know what difference the availability of counsel might have made in any particular termination proceeding. For example, we cannot know whether counsel for respondent-mother in this case would have been able to

---

view, at least, a much stronger showing than that which exists in this case is necessary to establish the existence of an implied waiver of the right to counsel in a termination of parental rights proceedings, to the extent that such an implied waiver can occur at all.

provide documentation that respondent-mother did, in fact, make progress toward addressing the mental health, substance abuse, and domestic violence problems that led to the trial court's decision that grounds for terminating respondent-mother's parental rights in the children existed here. As a result, we conclude that respondent-mother is entitled to a new termination hearing in which her statutory right to counsel has been adequately protected.

Thus, for the reasons set forth above, we conclude that the trial court erred by allowing Mr. Dawson to withdraw from his representation of respondent-mother without making an adequate inquiry into the circumstances surrounding the making of that motion and by failing to inquire, at the time that respondent-mother appeared at the termination hearing, whether she was represented by counsel, whether she wished to apply for court-appointed counsel, or whether she wished to represent herself. As a result, the trial court's termination orders are reversed and this case is remanded to the District Court, Lenoir County, for further proceedings not inconsistent with this opinion, including the holding of a new termination hearing.

REVERSED AND REMANDED.

Justice MORGAN dissenting.

I respectfully dissent from the majority view in this case. While I appreciate the laudable foundation upon which my distinguished colleagues of the majority construct their determinations in this case, this foundation perilously undermines and potentially supplants more deeply fundamental aims of justice relating to the best interests of children and the integrity of the judicial process. With this concern, I disagree with the conclusion of the majority that "the trial court erred by allowing [respondent-mother's privately retained counsel] Mr. Dawson's motion to withdraw from his representation of respondent-mother and permitting respondent-mother to represent herself at the termination hearing without ensuring that she had knowingly and voluntarily waived her right to the assistance of counsel." I likewise take issue with the majority's expansion of this determination that "the trial court erred by allowing Mr. Dawson to withdraw from his representation of respondent-mother without making an adequate inquiry into the circumstances surrounding the making of that motion and by failing to inquire, at the time that respondent-mother appeared at the termination hearing, whether she was represented by counsel, whether she wished to apply for court-appointed counsel, or whether she wished to represent herself." While I agree with the majority that respondent-mother's behavior regarding the status of her legal representation was not so egregious as to amount to her forfeiture of the right to counsel, nonetheless I am convinced that respondent-

mother's conduct was sufficiently serious to constitute waiver of counsel. Therefore, I would affirm the trial court's actions in this matter and would find that there was no error committed by the trial court.

The majority is excruciatingly generous in observing that "respondent-mother's level of engagement with the proceedings before the trial court in connection with this termination proceeding was certainly less than exemplary"; indeed, the termination of parental rights hearing served as the capstone of trial court proceedings in which respondent-mother was cavalier in her interactions with her attorneys and with the judicial system. Utilizing the majority's own opinion here to chronicle examples of respondent-mother's approach to these important proceedings: 1) respondent-mother failed to appear for a permanency planning review hearing held on 16 April 2019 at which her court-appointed counsel appeared and for which respondent-mother had notice; 2) respondent-mother had not been in contact with her court-appointed counsel since the previous trial court hearing which had been conducted on 20 November 2018; 3) respondent-mother failed to appear for her contempt hearing on 30 April 2019 concerning her failure to appear for the 16 April 2019 permanency planning review hearing because she reported to a different courtroom in which her former counsel located her and aided the attainment of another court date for respondent-mother's contempt hearing; 4) respondent-mother failed to appear for her rescheduled contempt hearing on 14 May 2019, with her counsel reporting to the trial court on this occasion that the attorney "attempted to

secure [respondent-mother's] presence in court today for this" but was "unable to do so"; 5) respondent-mother appeared for the 11 June 2019 termination of parental rights hearing some sixteen minutes after the matter had been called to be conducted; 6) as a participant in the 11 June 2019 termination hearing, respondent-mother abruptly left the courtroom without explanation during the proceedings.

Amidst all of this, the majority secures its view in the operation of N.C.G.S. § 7B-1101.1(a) (2019), which states, in pertinent part, that in a termination of parental rights case, "[t]he parent has the right to counsel, and to appointed counsel in cases of indigency, unless the parent waives the right." Based on this statute, the majority cobbles together a series of acts which the trial court should have performed at certain stages of respondent-mother's maneuvers with her counsel and resulting consequences: 1) at an 8 January 2019 hearing, the trial court honored respondent-mother's desire to waive her right to the assistance of court-appointed counsel and to hire her own counsel; however, in the majority's view, "the waiver of counsel form that respondent-mother completed at the time that [respondent-mother's court-appointed counsel] Mr. Perry was allowed to withdraw from his representation of respondent-mother in the termination proceeding was intended to facilitate her employment of privately-retained counsel and did not constitute a waiver of her right to any and all counsel"; 2) at the 14 May 2019 show cause hearing at which respondent-mother failed to appear, the trial court allowed the motion of her retained counsel, Mr. Dawson, to withdraw, based on the counsel's representations that the

attorney had not been able to obtain respondent-mother's presence in court for the hearing; however, in the majority's view, despite the retained counsel's status as an officer of the court and his representation to the trial court that respondent-mother had requested the retained counsel to withdraw from his representation of her, nonetheless the majority expresses concern that "neither the certificate of service attached to Mr. Dawson's withdrawal motion nor any related correspondence shows that respondent-mother was served with a copy of the withdrawal motion prior to the date upon which Mr. Dawson was allowed to withdraw" and also that,

> at the time that his withdrawal motion was heard, the trial court does not appear to have made any inquiry into whether respondent-mother had been served with the withdrawal motion; whether Mr. Dawson had informed respondent-mother that he intended to move to withdraw on that date; why respondent-mother had requested Mr. Dawson to withdraw, including whether his withdrawal motion resulted from respondent-mother's inability to pay for his services; and what efforts Mr. Dawson had made to ensure that respondent-mother understood the implications of the action that he proposed to take or to protect her statutory right to the assistance of counsel. As a result, given the very limited inquiry that the trial court undertook before allowing Mr. Dawson's withdrawal motion, we conclude that the trial court erred by allowing that motion[;]

3) at the 11 June 2019 termination of parental rights hearing at which respondent-mother made a tardy appearance after the hearing had already begun, respondent-mother had already been granted her request by the trial court to sign a waiver of counsel form to indicate that she would be responsible for hiring her own attorney for

representation in these proceedings, and had already expressed her desire for her

retained counsel to cease representation of her, as related to the trial court by the

attorney and upon such information, the trial court granted counsel's motion to

withdraw; however, while the majority frankly acknowledges that, at the 11 June

2019 termination hearing

> respondent-mother did not ask the trial court to conduct an inquiry into the issue of whether she wished to represent herself or desired to request the appointment of counsel following her tardy arrival at the termination hearing. On the other hand, nothing in the record suggests that respondent-mother knew that she had the right to do so or that the trial court informed her that such an option was available. . . . At an absolute minimum, given that respondent-mother had never waived the right to all counsel, the trial court violated N.C.G.S. § 7B-1101.1(a1) by allowing respondent-mother to represent herself at the termination hearing without having "examin[ed] [respondent-mother] and mak[ing] findings of fact sufficient to show that" respondent-mother "knowing[ly] and voluntar[ily]" wished to proceed *pro se.*

At most, these numerous requirements which the majority has imposed upon

trial courts in circumstances in which N.C.G.S. § 7B-1101.1(a1) (2019) is invoked as

an issue constitute best practices for a trial court to implement; however, in my

estimation, the failure to follow them as detailed by the majority does not constitute

error as the majority has decreed here. A trial court should not be compelled to look

at the circumstances in a vacuum *at* the termination of parental rights hearing with

regard to the sanctity of a respondent parent's right to counsel; a trial court should

be allowed to look at the circumstances *surrounding* the termination of parental

rights hearing with regard to a parent's right to counsel. In the present case, respondent-mother had routinely frustrated her attorneys' efforts and flouted the trial court's administration of justice in the choices that she elected to make regarding her adherence to the judicial process.

The best interests of the juvenile are of paramount consideration by the court. N.C.G.S. § 7B-100(5) (2019). This state's approach to controversies involving child neglect is that the best interest of the child is the polar star. *In re Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 251–52 (1984). The power of the trial judge to maintain absolute control of his courtroom is essential to the maintenance of proper decorum and the effective administration of justice. *State v. Ford*, 323 N.C. 466, 469, 373 S.E.2d 420, 422 (1988). From my vantage point, the trial court properly balanced all of the potentially competing interests before it in properly applying N.C.G.S. § 7B-1101.1(a1) on its face regarding respondent-mother's right to counsel in a termination of parental rights proceeding, promoting the best interests of the two children at issue in the present case by conducting the termination hearing in an effort to bring the juveniles to permanence rather than to yield to further upheaval of court proceedings by respondent-mother, and preserving proper decorum and the effective administration of justice by including respondent-mother as a participant in the termination hearing to represent her own interests after her desire to relieve her previous two attorneys from responsibility for her representation was allowed by the trial court. On the other hand, the new duty for a trial court which the majority

creates upon its expansion of N.C.G.S. § 7B-1101.1(a1) requires, in a case like this one, that after a respondent-parent in a termination of parental rights case has signed a knowing and voluntary waiver to court-appointed counsel and subsequently gotten retained counsel to withdraw, that the trial court must halt the termination proceedings during the presentation of evidence in order to accommodate the late arrival of the respondent-parent in order to make a new inquiry of the respondent-parent's desire for counsel, thereby potentially suspending the hearing and delaying the establishment of a permanent home for the juveniles. Based upon my recognition of this needless collision of critical fundamental principles which could and should be mutually promoted, I respectfully dissent.

Justice NEWBY joins in this dissenting opinion.